UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GUADALUPE ACOSTA,<br><br>                              Plaintiff,<br><br>            -v-<br><br>KENNEDY CHILDREN'S CENTER,<br><br>                              Defendant. | 24 Civ. 3358<br><br>OPINION & ORDER |

PAUL A. ENGELMAYER, District Judge:

Plaintiff Guadalupe Acosta brings this action against her former employer, Kennedy

Children's Center ("KCC"), for which she worked as an outreach coordinator between August

and October 2022.  She alleges that KCC discriminated and retaliated against her by discharging

her because of her disability and gender.  Acosta brings claims under the Americans with

Disabilities Act of 1990, 42 U.S.C. § 2000 *et seq.* ("ADA"), the New York State Human Rights

Law ("NYSHRL"), N.Y. Exec. Law § 296 *et seq.*, and the New York City Human Rights Law

("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*

Two motions are pending.  First, KCC moves to dismiss Acosta's Amended Complaint,

Dkt. 14 ("AC"),[1] for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

Second, Acosta moves for leave to further amend the AC to replead any dismissed claims.

For the reasons that follow, the Court denies the motion to dismiss as to the AC's

disability discrimination and retaliation claims, but grants the motion as to its gender

discrimination claims.  The Court separately denies Acosta's motion for leave to further amend.

---

[1] For the reasons discussed, *see infra* Part I.B, the Court cites to the red-line version of Acosta's
AC, filed at Docket 14-1, when referencing her allegations.

## I.     Background[2]

### A.     Factual Background

#### 1.     The Parties

KCC is a privately owned pre-school based in New York, with a primary campus in Manhattan, AC ¶ 8, and a secondary campus in the Bronx, *id.* ¶ 23.  Acosta, a New York resident, was employed by KCC as an outreach coordinator. *Id.* ¶¶ 7, 14.  Acosta alleges that KCC had supervisory authority over her, including the ability to fire her, control the terms and conditions of her employment, and determine the rate and method of compensation for her services. *Id.* ¶ 9.

#### 2.     Overview of Acosta's Factual Allegations

On August 1, 2022, KCC hired Acosta as an outreach coordinator in its Manhattan pre-school. *See id.* ¶¶ 14, 16.  In that role, she managed, interviewed, and recruited teacher assistants, and provided resources such as childcare and school supplies. *Id.* ¶ 15.

On October 12, 2022, Acosta stood on the sidewalk adjacent to KCC while speaking with a co-worker. *Id.* ¶¶ 16–17.  During this conversation, an unidentified man walked past Acosta, stared at her "menacingly," and, shortly after, lunged towards her while stroking his exposed genitals. *Id.* ¶¶ 17–19.  After the co-worker unsuccessfully attempted to pepper-spray the stranger, she and Acosta ran across the street. *Id.* ¶ 20.  From that position, Acosta witnessed the

---

[2] The Court draws the following facts principally from Acosta's AC. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").  For purposes of resolving the motion to dismiss under Rule 12(b)(6), the Court accepts all factual allegations in the AC as true, drawing all reasonable inferences in Acosta's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

stranger ejaculate while staring at her. *Id.* ¶ 21. The incident left Acosta "incredibly shaken, disturbed, and frightened." *Id.* ¶ 22.

The next day, Acosta asked to work from home, a request which was granted. *Id.* ¶ 23. On October 14, 2022, Acosta worked at KCC's pre-school campus in the Bronx. *Id.* ¶ 23.

On October 17, 2022, Acosta returned to work at KCC's Manhattan campus. *Id.* ¶ 24. However, during her commute, she "experienced symptoms of a panic attack, including shortness of breath, difficulty breathing, racing pulse, and near loss of consciousness due to the anxiety and terror she felt returning to the location of her traumatic incident." *Id.* ¶ 24. That day, she notified Carolyn Cleveland, KCC's chief operating officer, of the incident, stating that, due to the traumatizing assault, in the future, she would often be unable to work at the Manhattan campus. *Id.* ¶ 25. Cleveland told Acosta she would consider the request as it might be possible for her to work remotely, and directed Acosta to speak with Jeanne Alter, KCC's executive director, the next day. *Id.* ¶ 25. Cleveland added that Acosta's co-worker was a "magnet for things like that," referring to the sexual assault, and asked that the co-worker escort Acosta to her car because she "is tough; she is so Bronx." *Id.* ¶ 26.

The next day, Alter met with Acosta to discuss the incident. *Id.* ¶ 27. Acosta again asked to work from home, stating that "she felt KCC must protect its employees." *Id.* ¶ 27. Alter permitted Acosta to work remotely for the rest of the week, and told Acosta that she might be able to continue working from home if she sought therapy. *Id.* ¶ 27. Acosta did so that same week. *Id.* ¶ 27.

On October 20, 2022, Acosta spoke with Victorio Milian, KCC's human resources director, about the incident and asked to work from home. *Id.* ¶ 28. Milian told Acosta he would call her back with more information concerning her request. *Id.* ¶ 28. Approximately one hour

3

later, Milian told Acosta, "There is nothing we can do. Your last day will be Tuesday, October 25th." *Id.* ¶ 29. Acosta alleges that, in an attempt to complete her employment in good standing, she asked Milian, over email, whether she could instead work remotely for two weeks, which he denied. *Id.* ¶ 31.

On October 21, 2022, Acosta filed a police report concerning the incident. *Id.* ¶ 33. She was told that investigating police officers thereupon visited KCC. *Id.* ¶ 33.

On October 24, 2022, Alter and Milian met with Acosta to discuss the incident and, ultimately, terminate her employment. *Id.* ¶ 34. During this meeting, Alter stated:

> Things like this happen all the time. It's a rough neighborhood and I can't protect everyone. I'm a businesswom[a]n[,] not an expert[,] but it seems like you have [post-traumatic stress disorder,] and you need help. A few years ago[,] we had a staff member get assaulted and she received help and came back to work. It was not a big deal.

*Id.* ¶ 35. Alter explained she could not grant Acosta's request to work remotely without a mental health diagnosis. *Id.* ¶ 36. Acosta responded that although she had already sought therapy, she could not have received a formal diagnosis based on the single session she was able to attend between the assault and her termination. *Id.* ¶ 36. During the meeting, Milian asked Acosta not to tell others about the incident, stating "there is no need to inform the staff of what happened," and that doing so "would only complicate things for [KCC]." *Id.* ¶ 39.

## B.    Procedural History

Acosta filed charges of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). *See* AC ¶ 4; Dkt. 1 at 13. On February 1, 2024, she received a right to sue letter from the EEOC. Dkt. 1 at 13. On May 1, 2024, she filed an initial complaint. Dkt. 1.

On June 7, 2024, Acosta and KCC filed a joint letter proposing a briefing schedule for KCC's anticipated motion to dismiss. Dkt. 8. On June 11, 2024, the Court, by order, stated that it would approve the proposed briefing schedule, but cautioned Acosta that, by agreeing to such,

she would be waiving her right under Rule 15(a)(1)(B) to amend her complaint once as a matter of course. Dkt. 9. The Court directed Acosta to file a letter stating whether she agreed to do so. *Id.*

The next day, Acosta attempted to file an amended complaint, but, because more than 21 days had passed since service of the original pleading, she needed leave to do so. Dkt. 10. On June 17, 2024, Acosta sought such leave, noting that she "waive[d] her right under Rule 15(a)(1)(B) to amend the complaint once as a matter of course and consent[ed] to the joint briefing schedule previously filed on June 7, 2024." Dkt. 11. The next day, the Court granted Acosta leave to file her amended complaint, provided that she attach a red-line reflecting its changes. Dkt. 12. The Court also approved the proposed briefing schedule, reminding Acosta that "after the Court's resolution of the motion to dismiss, [she] w[ould] not have an additional opportunity to amend the complaint." *Id.*

On June 25, 2024, Acosta sought leave to file her AC, attaching a red-line copy of the proposed changes. Dkt. 14-1. On June 28, 2024, the Court granted Acosta leave to so file. Dkt. 15. Acosta did not thereafter file a clean version of the amended complaint.

On August 15, 2024, KCC filed a motion to dismiss, Dkt. 18, a supporting memorandum of law, Dkt. 19 ("Def. Br."), and a declaration, Dkt. 18-1. On September 27, 2024, Acosta filed an opposition, Dkt. 21 ("Pl. Br."), and a declaration, Dkt. 22. On October 18, 2024, KCC filed a reply. Dkt. 25 ("Def. Reply").

## II.    Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly

dismissed where, as a matter of law, "the allegations in a complaint, however true, could not

raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. For the purpose of resolving

the motion to dismiss, the Court must assume all well-pled facts to be true, drawing all

reasonable inferences in favor of the plaintiff. *See Koch*, 699 F.3d at 145. However, that tenet

"is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only

"labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not

do." *Twombly*, 550 U.S. at 555.

## III.    Discussion

The AC brings the following claims: (1) disability discrimination under the ADA,

NYSHRL, and NYCHRL; (2) gender discrimination under the NYSHRL and NYCHRL; and

(3) retaliation under the NYSHRL and NYCHRL. [3]  KCC moves to dismiss all claims. The

Court addresses KCC's motion to dismiss first, then Acosta's motion for leave to amend.

### A.    Acosta's Disability Discrimination Claims

The AC alleges that KCC, in violation of the ADA, NYSHRL, and NYCHRL,

discriminated against her based on an actual or perceived disability (post-traumatic stress

---

[3] In her brief, Acosta stated that she was withdrawing her vicarious liability claim against KCC. *See* Pl. Br. at 2 n.1 ("Plaintiff concedes that vicarious liability is not a standalone claim, and that the sixth cause of action should be removed. Plaintiff has requested leave to file a second amended complaint, and will remove this cause of action if leave is granted."). In apparent contradiction, however, she later stated that, because KCC assertedly had failed to address this claim, it had waived any opposition. *Id.* at 21–22. In fact, that factual premise was incorrect. *See* Def. Br. at 18 (contesting vicarious liability). In any event, because, as Acosta recognized, the NYCHRL's employer liability provision does not support such a cause of action, and separately because such would duplicate her other claims, *see Scott v. YSB Servs. Inc.*, No. 21 Civ. 7711, 2024 WL 1330043, at *7 (S.D.N.Y. Mar. 28, 2024) (collecting cases), the Court grants KCC's motion to dismiss Acosta's vicarious liability claim.

disorder ("PTSD")) and failed to provide her with a reasonable accommodation (remote work) for that disability.[4] *See, e.g.*, AC ¶¶ 37–38, 53–56.

**1.    ADA**

The ADA defines "discrimination" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).  It also prohibits "discriminat[ion] against a qualified individual" based on "disability in regard to . . . [the] discharge of employees." *Id.* § 12112(a).  Important here, "[t]he ADA protects not just those employees who are actually disabled, . . . but also those who are discriminated against because they . . . are 'regarded as having such an impairment.'" *Sharikov v. Philips Med. Sys. MR, Inc.*, 103 F.4th 159, 166–67 (2d Cir. 2024) (quoting 42 U.S.C. § 12102(1)(B)–(C)).

To establish a *prima facie* case of disability discrimination under the ADA, a plaintiff must show that "(1) the employer is subject to the ADA, (2) the employee is disabled or is perceived to be disabled as defined by the ADA, (3) the employee is qualified to perform the essential functions of the job, with or without reasonable accommodations, and (4) the employee suffers an adverse employment action because of his disability." *Id.* at 166.  Where a plaintiff alleges a failure to accommodate his disability, he "also must satisfy the first three factors," but, as to the fourth, he must show his "employer refused to make a reasonable accommodation." *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020) (citation omitted).  To survive a motion to

---

[4] The Court construes Acosta's AC to pursue claims for both disability discrimination and failure to accommodate. *See, e.g.*, AC ¶ 37 ("Defendant terminated Plaintiff in part so [it] would not have to grant her any accommodations on the basis of her perceived disability.").

dismiss, claims of disability discrimination or a failure to accommodate "need only allege facts to support [the plaintiff's] prima facie case." *Morey v. Windsong Radiology Grp., P.C.*, 794 F. App'x 30, 32 (2d Cir. 2019). These standards are "minimal" and "not onerous." *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (citation omitted); *see also Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 21 (2d Cir. 2015).

The AC undisputedly pleads that KCC is an employer subject to the ADA. KCC argues that the AC does not plausibly allege the other factors. The AC's salient allegations as to these are that (1) Acosta's mental health conditions qualify her as a person with an actual and/or perceived disability, *see* AC ¶¶ 22, 24; (2) KCC was on notice of the disability as a result of Acosta's conversations with her superiors about the incident, its impact, and her requests for accommodation, *see id.* ¶¶ 23–36, and by the police visit triggered by her report of the incident, *see id.* ¶ 33; (3) the reasonable accommodation she sought—working from home—would allow her to complete her duties as an outreach coordinator, *see id.* ¶¶ 15, 23; (4) KCC had permitted her to work from home multiple times, during which she successfully performed her duties, *see id.* ¶¶ 23, 32; and (5) KCC improperly refused to make such an accommodation thereafter, *see id.* ¶¶ 29, 31, 36.

### a.    *Disability under the ADA*

KCC first argues that the AC does not plausibly plead that Acosta had a perceived or recorded disability under the ADA. Def. Br. at 5–8. It further argues that, even if her PTSD so qualified, the AC does not plead that, with accommodations, Acosta could perform the essential functions of her job, *id.* at 8, or that her termination was tied to her disability, *id.* at 9–10.

Under the ADA, a "disability" includes "a physical or mental impairment that substantially limits one or more major life activities," "a record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1). Mental impairments

8

include "[a]ny mental or psychological disorder, such as an . . . emotional or mental illness."

29 C.F.R. § 1630.2(h)(2). "[M]ajor life activities include," among other things, "[c]aring for

oneself," "performing manual tasks," "standing," "breathing," "concentrating," "thinking,"

"communicating," and "working." 42 U.S.C. § 12102(2)(A). A three-step inquiry guides

whether an individual is disabled:

> First, a court must determine whether the plaintiff suffers from a physical or mental
> impairment. Second, the court must identify the life activity upon which the
> plaintiff relies and determine whether it constitutes a major life activity under the
> ADA. Third, the court determines whether the identified impairment substantially
> limited that life activity.

*Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 539 (S.D.N.Y. 2009) (citing *Bragdon v. Abbott*, 524

U.S. 624, 631 (1998)).

The AC adequately pleads a *prima facie* case that Acosta was disabled.

As to the first and second steps of the inquiry, the AC alleges that Acosta was "incredibly

shaken, disturbed, and frightened" by the incident in the vicinity of KCC's Manhattan campus,

AC ¶ 22, that she suffered from mental health conditions including actual or perceived PTSD,

panic attacks, and anxiety, *see id.* ¶¶ 1, 24, 38, 42, 59, and that she promptly sought therapy and

treatment within a week of her assault, *id.* ¶ 27, although a diagnosis could not be made based on

the one session she attended in the week between the assault and her termination, *see id.* ¶ 36.

KCC, noting that the AC does not plead whether Acosta later continued therapy, faults the AC

for not alleging the frequency, duration, or severity of the symptoms that she contends qualify as

PTSD. Def. Br. at 6. But that argument fails, because the AC pleads, at a minimum, facts

plausibly supporting that Acosta had a perceived disability, to wit, PTSD, as of her termination.

*See, e.g., id.* ¶¶ 16–22, 35. Towards that end, it pleads that the "traumatizing" assault brought

on, upon her return to the Manhattan campus, "symptoms of a panic attack, including shortness

of breath, difficulty breathing, racing pulse, and near loss of consciousness, due to the anxiety

and terror she felt returning to the location of her traumatic incident," *id.* ¶ 24–25; that Acosta

that day notified KCC's chief operating officer, Cleveland, of the incident and her inability to

work at the campus "due to the traumatizing nature of the ordeal," *id.* ¶ 25; that Cleveland asked

a co-worker to walk Acosta to her car, *id.* ¶ 26; and that Acosta the next day discussed the

incident with KCC's executive director, Alter, who, in recognition of Acosta's trauma, permitted

her to work from home the rest of the week while urging her to pursue therapy, which she did, *id.*

¶ 27. Whether Acosta in fact had or later was diagnosed with PTSD, the facts pled—her

narrative to her supervisors and their reactions to it—readily support that, as of her termination,

she was perceived to have a disability. Indeed, Alter said that to Acosta: "[I]t seems like you

have PTSD and you need help." *Id.* ¶ 35. *See, e.g., Hampson v. State Farm Mut. Auto Ins. Co.*,

No. 112 Civ. 258, 2015 WL 12733387, at *9, 15 (N.D.N.Y. Mar. 26, 2015) (finding knowledge

of disability where supervisor cited disability when recommending employee's termination);

*Nodelman v. Gruner & Jahr USA Pub.*, No. 98 Civ. 1231, 2000 WL 502858, at *10 (S.D.N.Y.

Apr. 26, 2000) (similar). And Acosta's breathing and consciousness, both of which the AC

alleges were impaired, qualify as major life activities. *See* 42 U.S.C. § 12102(2)(A); *see, e.g.*,

*Hoeffner v. Cnty. of Orange*, No. 17 Civ. 9344, 2020 WL 1165851, at *6 (S.D.N.Y. Mar. 10,

2020) (concluding at summary judgment that asthma attacks that occurred solely at plaintiff's

worksite could substantially limit breathing and working); *Murtha v. N.Y. State Gaming*

*Comm'n*, 17 Civ. 10040, 2019 WL 4450687, at *10–11 (S.D.N.Y. Sept. 17, 2019) (similar).

    As to the third step of the inquiry, the AC alleges that, as a result of the above symptoms,

Acosta told the KCC executives that "she would be unable to work onsite frequently moving

forward." *Id.* ¶ 25. Her account to them is of an impairment "substantially limit[ing]" such a life

activity, within the meaning of the ADA as amended by the 2008 ADA Amendments Act

("ADAAA"), Pub.L. No. 110–325, 122 Stat. 3553 (2008). The EEOC, tasked with

implementing regulations for the ADA, clarified that "[t]he term 'substantially limits' shall be

construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms

of the ADA." 28 C.F.R. § 35.108(d)(1)(i). That test compares the plaintiff "to most people in

the general population"; the alleged "impairment need not prevent, or significantly or severely

restrict, the individual from performing a major life activity in order to be considered

substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). That standard is met here. As pled, Acosta,

after the traumatizing incident, had an impairment not shared by most people in the general

population, and which impeded her from in-person work as an outreach coordinator at the

Manhattan campus. *See e.g., Hoeffner*, 2020 WL 1165851, at *6 (months-long breathing

impairment adequately pled to constitute disability that substantially limited work); *Ugactz v.

United Parcel Serv., Inc.*, No. 10 Civ. 1247, 2013 WL 1232355, at *9 (E.D.N.Y. Mar. 26, 2013)

(finding indefinite mental impairment qualified as a disability that substantially limited work);

*Reilly*, 620 F. Supp. 2d at 539–40 (months-long mental impairment adequately pled to constitute

disability that substantially limited work). The AC pleads that Acosta said just that to KCC in

real time: that, as a result of her disability, she would be "unable to work onsite frequently." AC

¶ 25.

    The AC thus plausibly alleges a disability within the ADA which substantially interfered

with Acosta's work.

       *b.*    *Essential functions of Acosta's job*

    KCC next argues that Acosta, even with a reasonable accommodation, could not perform

the essential functions of an outreach coordinator, because that position "required her to work

on-site." Def. Br. at 8; *see* Def. Reply at 5–6. "'Essential functions' are defined under EEOC

regulations to mean the 'fundamental' duties to be performed in the position in question, but not functions that are merely 'marginal.'" *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003) (quoting *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997)).

KCC will have the opportunity following discovery to litigate its contention that remote work was untenable given the nature of Acosta's job responsibilities. But the facts pled preclude a dismissal on this basis. The AC pleads that Acosta could perform, from home, her essential duties, such as managing, interviewing, and recruiting teacher assistants, and providing childcare and school supplies, and indeed had done so, repeatedly, in the past. *See id.* ¶¶ 15, 32. Indeed, it pleads, KCC had previously permitted her to work remotely, and, after the assault, its chief operating officer, *see id.* ¶ 25, and executive director, *see id.* ¶ 27, both stated it might be possible for Acosta to do so in the future. It further alleges that the executive director told her that, upon a mental health diagnosis, KCC could arrange to accommodate her condition. *See id.* ¶ 36. However, it pleads, in the week between the assault and the termination, Acosta had been unable to obtain a formal such diagnosis. *Id.* ¶ 36.

Given these pleadings, KCC's defense on this ground cannot be resolved in its favor. Taking all factual allegations in the AC as true, it adequately pleads that, with a reasonable accommodation, Acosta could perform the essential functions of her position with the accommodation of working remotely.

> c. *Adverse Employment Action Resulting from Discrimination*

KCC next disputes that Acosta suffered an adverse employment action because of her disability.[5] Acosta's termination was the quintessential adverse employment action. *See Robinson v. Dibble*, 613 F. App'x 9, 12 (2d Cir. 2015) (termination constituted "adverse

---

[5] KCC does not dispute the adequacy of the AC's pleading that it refused to make a reasonable accommodation.

employment action"); *Reilly*, 620 F. Supp. 2d at 544 ("[T]ermination constitutes adverse employment action."). And the inference that Acosta's termination resulted from her perceived PTSD easily follows from the pleadings here.

An inference of discrimination can arise from circumstances including "the sequence of events leading to the plaintiff's discharge," *Littlejohn v. City of N.Y.*, 795 F.3d 297, 312 (2d Cir. 2015) (citation omitted), including the temporal proximity between disclosure of the disability and the termination, *see, e.g.*, *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 326 (S.D.N.Y. 2020) (collecting cases). Here, the short (one-week) passage between, on the one hand, Acosta's disclosure of her condition and request for accommodation, and, on the other, her termination, powerfully support the inference of discrimination. Indeed, KCC's human resources director, Milian, told her within *one hour* of her requesting a reasonable accommodation that the request was denied and she was being terminated. *See AC* ¶¶ 28–29. The case law reflects that a causal inference based on temporal proximity may arise even when the gap between such events is two months long. *See, e.g.*, *Dooley*, 636 F. App'x at 21 (unpaid suspension two months after employer's learning of disability and termination one-and-a-half months thereafter supported inference of discrimination under ADA); *Beauchine v. City of Syracuse*, 21 Civ. 845, 2024 WL 2700874, at *27 (N.D.N.Y. May 24, 2024) (denial of promotion two months after disability discrimination complaint supported inference of causal connection). And, the AC alleges, during the conversation in which Acosta was terminated, KCC's executive director, Alter, overtly referenced Acosta's disability and demand for accommodation. Alter stated: "I'm a businesswom[a]n[,] not an expert[,] but it seems like you have PTSD and you need help." *Id.* ¶ 35. She added that "there was no way to grant [Acosta] an accommodation without a mental health diagnosis." *Id.* ¶ 36.

The AC thus clearly alleges facts supporting the inference that KCC terminated Acosta based on her disability. The Court denies the motion to dismiss Acosta's ADA claims.

### 2. NYSHRL

The AC also alleges that KCC discriminated against her in violation of the NYSHRL. *Id.* ¶¶ 57–59. Because the ADA claim survives, the NYSHRL claim necessarily does, too. *See Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 76 (2d Cir. 2019); *see, e.g., Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (ADA standard governs NYSHRL claim); *McKenna v. Santander Inv. Sec. Inc.*, No. 21 Civ. 941, 2022 WL 2986588, *7 (S.D.N.Y. July 28, 2022) ("Claims under the NYSHRL for a failure to accommodate are governed by the same legal standards as federal ADA claims." (citing *Fox*, 918 F.3d at 76)).

The Court therefore denies the motion to dismiss the NYSHRL claims.

### 3. NYCHRL

Acosta's disability discrimination claim under the NYCHRL similarly survives based on the well-pled ADA claim. Such claims are read "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (citation omitted). The NYCHRL defines a disability as "any physical, medical, mental or psychological impairment, or a history or record of such impairment." N.Y.C. Admin. Code § 8-102. It defines a "physical, medical, mental, or psychological impairment" as "[a]n impairment of any system of the body; including, . . . the neurological system[.]" *Id.* Relative to the ADA, the NYCHRL provides "greater protection against disability-based discrimination." *Jacobsen v. N.Y.C. Health & Hosps. Corp.*, 22 N.Y.3d 824, 833–34 (N.Y. 2014).

The Court therefore denies the motion to dismiss the NYCHRL claim.

### B.    Acosta's Gender Discrimination Claims

The Court next addresses KCC's motion to dismiss the claims of gender discrimination under the NYSHRL and NYCHRL.

### 1.    NYSHRL

The AC alleges that KCC discriminated against Acosta on the basis of her gender, because she had complained of the sexual assault and of KCC's unsafe environment. *See* AC ¶¶ 1, 42–44, 57–59. It alleges that "[b]ut for the fact that [Acosta] is a female with a perceived disability, [KCC] would not have treated her differently." *Id.* ¶ 44.

The NYSHRL makes it "an unlawful discriminatory practice" for an employer, based on gender or sex, "to discharge from employment . . . or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a). To establish a *prima facie* case of sex discrimination, a plaintiff must demonstrate "that (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019) (citation omitted). A complaint must "plausibly allege that (1) the employer took adverse action against [the plaintiff] and (2) h[er] race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015). It may do so by "alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.* In short, the complaint must plead facts that provide "at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn*, 795 F.3d at 311.

The AC pleads the first three elements of a *prima facie* case: She is a member of a protected class, as a woman, AC ¶ 7; she satisfactorily performed her duties as an outreach coordinator, *see id.* ¶¶ 14–15, 47; and she suffered the adverse employment action of termination, *id.* ¶¶ 34, 42–44. KCC argues, however, that the AC does not adequately plead a causal connection between Acosta's gender and her termination. Def. Br. at 13.

KCC is correct. The AC's allegations to this effect are wholly conclusory. It alleges that Acosta "was discriminated and retaliated against by [KCC], solely due to her sex/gender (female)," AC ¶ 42, and "because she is female and she complained about the sexual harassment and unsafe environment that she was facing while employed by [KCC]," *id.* ¶ 43. However, on a challenge to the pleadings, conclusory allegations must be set aside. *See Iqbal*, 556 U.S. at 681 (when "allegations are conclusory" they are "not entitled to be assumed true" (citing *Twombly*, 550 U.S. at 554–55)); *Pungitore v. Barbera*, 506 F. App'x 40, 42 (2d Cir. 2012) (summary order) ("A court must first ignore mere conclusory statements[.]" (citation omitted)). And the AC's factual allegations all concern Acosta's disability, not her gender. KCC's executive director, Alter, for example, is pled to have stated that "I'm a businesswom[a]n[,] not an expert[,] but it seems like you have PTSD and you need help," AC ¶ 35, to have referred to Acosta's mental health, and to have "stated that there was no way to grant [Acosta] an accommodation without a mental health diagnosis," *id.* ¶ 36. These statements, while overt about Acosta's disability, are silent about her gender. They could equally have been made about a male employee traumatized by a sexual assault near the workplace. The AC is devoid of any other allegations suggesting that Acosta's gender played any role in her termination.

Because the AC fails to plead a required element of a *prima facie* case of sex discrimination under the NYSHRL, the Court dismisses that claim.

### 2. NYCHRL

The same result follows under the NYCHRL. Until 2019, the NYCHRL, although using the same framework as the NYSHRL, contained more liberal pleading and proof standards. *See Deveaux v. Skechers USA, Inc.*, No. 19 Civ. 9734, 2020 WL 1812741, at *5 (S.D.N.Y. Apr. 9, 2020) (citing *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009)). A 2019 amendment to the NYSHRL, however, liberalized standards under that statute, with it as-yet unresolved whether the NYSHRL's standards now match those of the NYHCRL.[6] Regardless, to establish a sex discrimination claim under the NYCHRL, a plaintiff must "show differential treatment—that she was treated 'less well'" based on her gender. *Mihalik*, 715 F.3d at 110. The AC is devoid of any allegations plausibly supporting that inference.

The Court therefore dismisses the NYCHRL sex discrimination claims.

### C. Retaliation

The AC also alleges that Acosta was retaliated against in violation of the NYSHRL and NYCHRL.

---

[6] The amendment to the NYSHRL, effective October 11, 2019, put in place a more lenient standard of liability for employment claims that has been likened to that of the NYCHRL. *See Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP*, No. 21 Civ. 2512, 2022 WL 524551, at *9 (S.D.N.Y. Feb. 22, 2022) (amendment removed "severe and pervasive" requirement). The amended NYSHRL, like the NYCHRL, is to be construed "liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws including those laws with provisions worded comparably to the provisions of [the NYSHRL] have been so construed." *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020) (alteration in original) (citing N.Y. Exec. Law. § 300). The case law, however, has not definitively resolved whether the effect of the 2019 amendment is to make the NYSHRL's standard *identical* to that of the NYCHRL—or merely closer to it. *See Yost v. Everyrealm, Inc.*, 657 F. Supp. 3d 563, 578 (S.D.N.Y. 2023). *Compare Arazi v. Cohen Bros. Realty Corp.*, No. 20 Civ. 8837, 2022 WL 912940, at *16 (S.D.N.Y. Mar. 28, 2022) ("After that amendment, the standard for NYSHRL aligns with the NYCHRL standard for claims that accrued on or after October 11, 2019."), *with Wellner v. Montefiore Med. Ctr.*, No. 17 Civ. 3479, 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019) (amendment brings NYSHRL "closer to" NYCHRL standard).

1.    **NYSHRL**

The NYSHRL makes it unlawful for an employer to retaliate or discriminate against an employee because she "has opposed any practices forbidden under this article or because . . . she has filed a complaint, testified or assisted in any proceeding under this article." N.Y. Exec. Law § 296(7). "To establish a prima facie case of retaliation under the NYSHRL, . . . a plaintiff-employee must show that (1) she engaged in protected activity; (2) the employer was aware of this activity; (3) the employer took adverse action against the employee; and (4) a causal connection exists between the protected activity and the adverse action." *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 361–62 (S.D.N.Y. 2012). To state a retaliation claim, a complaint "must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against [the plaintiff] (2) because [s]he has opposed any unlawful employment practice." *Duplan v. City of N.Y.*, 888 F.3d 612, 625 (2d Cir. 2018) (quoting *Vega*, 801 F.3d at 90). The plaintiff's burden at the *prima facie* stage, however, is "de minimis." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

It is undisputed that Acosta's termination was an adverse employment action, *see* AC ¶ 34, and that, as pled, KCC was aware of Acosta's complaints and the police investigation that resulted from it, *see id.* ¶¶ 23–29, 31, 33. In moving to dismiss, KCC argues that the AC fails to adequately plead that (1) Acosta engaged in protected activity, and (2) a causal connection exists between that activity and her termination. *See* Def. Br. at 14–18; Def. Reply at 7–10.

The AC does, however, plausibly plead these elements, measured against the "reduced" showing required at this stage. *Littlejohn*, 795 F.3d at 316.

a.    *Protected Activity*

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Wright v. Monroe Cmty. Hosp.*, 493 F. App'x 233, 236 (2d Cir.

2012) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)).  The scope of such

activity is broad:  "When an employee communicates to her employer a belief that the employer

has engaged in . . . a form of employment discrimination, that communication virtually always

constitutes the employee's *opposition* to the activity."  *Littlejohn*, 795 F.3d at 317 (quoting

*Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009) (emphasis in

original)).  Protected activity may include formal and informal complaints, including complaints

to management, *see id.*, or requests for reasonable accommodation, *see Jenkins v. N.Y.C. Transit

Auth.*, 646 F. Supp. 2d 464, 473 (S.D.N.Y. 2009) (collecting cases).  For a complaint or request

for a reasonable accommodation to constitute protected activity, the plaintiff is required "to have

had a *good faith, reasonable belief* that he was opposing an employment practice made unlawful

by" the relevant statute.  *Gratton v. Jetblue Airways*, No. 4 Civ. 7561, 2005 WL 1251786, at *10

(S.D.N.Y. May 25, 2005) (emphasis in original) (quoting *McMenemy v. City of Rochester*, 241

F.3d 279, 285 (2d Cir. 2001)).

     Here, the AC identifies two activities as, ostensibly, protected: Acosta's (1) request,

which was denied, for a reasonable accommodation for her PTSD, *see AC* ¶¶ 28–29, 31, 34–38;

and (2) complaints about the corresponding need for KCC to protect its employees, *see id.* ¶ 27.

*See Knight v. City of N.Y.*, 303 F. Supp. 2d 485, 496 (S.D.N.Y. 2004), *aff'd*, 147 F. App'x 221

(2d Cir. 2005) (summary order) (informal complaints constitute protected activity).  The first

activity, her request to supervisors for permission to work remotely to accommodate her

traumatized mental health, is a paradigmatic example of a protected activity.  *See, e.g., Witcher

v. N.Y. City Dep't of Educ.*, No. 23-465, 2024 WL 3220264, at *3 (2d Cir. June 28, 2024)

("Obtaining a reasonable accommodation on account of a disability is a right granted or

protected by the ADA."); *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 149 (2d Cir. 2002)

("[S]eeking [a] reasonable accommodation . . . constitutes protected activity under . . . [the]

ADA." (citing *Muller v. Costello*, 187 F.3d 298, 311 (2d Cir. 1999)); *see also Saborit v. Harlem*

*Hosp. Ctr. Auxiliary, Inc.*, No. 19 Civ. 4686, 2021 WL 2709411, at *21 (S.D.N.Y. July 1, 2021)

("The elements of a retaliation claim are the same under the ADA, NYSHRL, and NYCHRL.").

That alone sustains this claim. The Court therefore does not have occasion to consider whether

the more thinly pled claim of a request by Acosta for protection in KCC's neighborhood, to the

extent capable of being decoupled from her request to work remotely, would independently

support the retaliation claim.

       *b.*    *Causal Connection*

    "To demonstrate a causal connection a plaintiff must show that the protected speech [or

conduct] was a substantial motivating factor in the adverse [] action." *Kiernan v. Town of*

*Southampton*, 734 F. App'x 37, 42 (2d Cir. 2018) (quoting *Smith v. Cnty. of Suffolk*, 776 F.3d

114, 118 (2d Cir. 2015)). A plaintiff may demonstrate proof of a causal connection *"indirectly*

by showing that the protected activity was followed closely by discriminatory treatment, or

through other evidence such as disparate treatment of fellow employees who engaged in similar

conduct, or *directly* through evidence of retaliatory animus directed against a plaintiff by the

defendant." *Id.* (quoting *DeCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir.

1987) (emphasis in original)).

    The AC clears that bar, plausibly pleading that Acosta's protected activity, at least in

part, brought about her termination. Its factual pleadings to this effect track those supporting the

inference of disability discrimination. Temporally, the termination followed closely on the heels

of Acosta's requests to superiors for an accommodation. Indeed, the AC alleges, Acosta was

notified of her termination just one hour after that request. *See* AC ¶¶ 28–29. And KCC's

human resources director, in that meeting with Acosta, attended also by the executive director,

overtly referred to Acosta's claim of PTSD and request for accommodation. *See id.* ¶ 35. The AC further alleges that, in the preceding days, KCC had changed its stance about whether to permit her to work remotely, *see e.g., id.* ¶¶ 25, 28–29; and sought to silence Acosta about the incident, *see id.* ¶ 39. These assembled circumstances, and particularly the close proximity of Acosta's termination relative to the onset of her disability and her requests for accommodation, strongly support the inference of retaliatory motivation. *See Gallo v. Alitalia-Linee Aeree Italiane-Societa per Azioni*, 585 F. Supp. 2d 520, 544 (S.D.N.Y. 2008) (causal connection plausibly pled under NYSHRL based on temporal proximity); *Clark Cnty.. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) ("very close" temporal proximity between employer's knowledge of protected activity and adverse employment action can satisfy *prima facie* element of causality).

The AC therefore plausibly pleads retaliation under the NYSHRL.

### 2. NYCHRL

The standard for retaliation claims under the NYCHRL is at least as broad as, if not broader than, that under the NYSHRL. *See Dodd v. City Univ. of N.Y.*, 489 F. Supp. 3d 219, 268 (S.D.N.Y. 2020); *see also supra* note 6. Because the AC's retaliation claim under the NYSHRL survives, the NYCHRL retaliation claim does, too. The Court therefore denies KCC's motion to dismiss that claim.

### D. Acosta's Motion for Leave to Further Amend the AC

Acosta seeks leave to replead any dismissed claims. A court "should freely give leave" for a party to amend its complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). But a court should deny a motion to amend if there is "evidence of undue delay . . . or futility." *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). And "where a scheduling order governs amendments to the complaint,

the lenient standard under Federal Rule of Civil Procedure Rule 15(a) must be balanced against the requirement under Rule 16(b) that the Court's scheduling order shall not be modified except upon a showing of good cause." *Holmes v. Grubman*, 568 F.3d 329, 334–35 (2d Cir. 2009) (cleaned up). "Whether good cause exists turns on the 'diligence of the moving party.'" *Id.* at 335 (quoting *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2003)).

The Court denies Acosta's motion for two reasons. First, Acosta's request for leave to further amend is unspecific as to the proposed amendments. Acosta merely states that she "has identified several areas that she could easily supplement, including the nature of her disability and her ability to perform the essential functions of her job." Pl. Br. at 22. The Court has found the AC's allegations as to these issues well pled. And as to the dismissed claims, Acosta does not make any mention, even generally, of any proposed curative amendments. Acosta's generic motion for leave to amend falls far short of demonstrating that justice requires such leave.

Second, Acosta urges that, under Rule 15, the Court "must permit a curative amendment unless such . . . would be inequitable or futile." *Id.* (citation omitted). But, because the Court here issued a scheduling order, any motions to amend are governed by the stricter standard of Rule 16(b). *See, e.g.*, *Outlaw v. City of N.Y.*, No. 22 Civ. 9288 (PAE), 2024 WL 4825955, at *6 (S.D.N.Y. Nov. 19, 2024) (extension qualified as a scheduling order and Rule 16(b) thus applied); *380544 Canada, Inc. v. Aspen Tech., Inc.*, 7 Civ. 1204, 2011 WL 4089876, at *3 (S.D.N.Y. Sept. 14, 2011) (court orders "act[ed] as the Rule 16 scheduling order"); *Volunteer Fire Ass'n of Tappan, Inc. v. Cnty. of Rockland*, No. 9 Civ. 4622, 2010 WL 4968247, at *3 (S.D.N.Y. Nov. 24, 2010) ("Rule 16(b) should apply. The Court by verbal order and then by endorsement set a deadline for the filing of an Amended Complaint, and it is immaterial that that deadline was not part of a formal Rule 16 scheduling order.").

Viewed under Rule 16(b), Acosta has not shown the good cause required to permit an amendment more than six months after the extended deadline for an amendment that the Court set at Acosta's request. Quite to the contrary, Acosta knew full well she would not have further opportunities to amend. In response to the parties' proposed briefing schedule that did not provide for an opportunity for Acosta to amend the complaint again, *see* Dkt. 8, the Court cautioned Acosta that it would "sign off on the proposed briefing schedule," provided that Acosta confirm her understanding that, by agreeing to such, she would be "giving up [her] right under Rule 15(a)(1)(B) to amend the complaint once as a matter of course," Dkt. 9. After missing the deadline to so amend, Acosta conceded that she had "waive[d] her right under Rule 15(a)(1)(B) to amend the complaint once as a matter of course and consent[ed] to the joint briefing schedule[.]" Dkt. 11. The Court nonetheless granted her leave to refile the AC, while noting that, as previously explained, "after the Court's resolution of the motion to dismiss, plaintiff will not have an additional opportunity to amend the complaint." Dkt. 12. With the Court now having resolved KCC's motion to dismiss, Acosta, consistent with the Court's express admonitions to this effect, will not have any further opportunities to amend her pleadings.

The Court accordingly denies Acosta's motion for leave to further amend the AC.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part KCC's motion to dismiss. The Court separately denies Acosta's motion for leave to further amend the AC. The Clerk of Court is respectfully directed to terminate the motions pending at Dockets 18 and 19.

Discovery will now commence. By January 24, 2025, the parties are to submit a proposed case management plan, consistent with the Court's individual rules, that provides for

the close of fact discovery by the end of May 2025.  By separate order, the Court will schedule

an initial pretrial conference, to be held telephonically on Wednesday, January 29th at 10:30 a.m.

        SO ORDERED.

*Paul A Engelmayer*

_____

PAUL A. ENGELMAYER
United States District Judge

Dated: January 10, 2025
       New York, New York